DOWD, J.

UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF OHIO
EASTERN DIVISION

| | | |
|---|---|---|
| United States of America, | ) | |
| | ) | CASE NO.  1:06 CR 75 |
| Plaintiff, | ) | |
| | ) | |
| v. | ) | MEMORANDUM OPINION |
| | ) | ANALYZING THE SENTENCING |
| Jesse Bonner, | ) | FACTORS SET FORTH IN 18 U.S.C. |
| | ) | SECTION  3553(a) |
| Defendant. | ) | |
| | ) | |

Introduction

Prior to considering the sentencing factors under 18 U.S. Code §3553(a), the Court

determined that the offense level for the defendant is 26 and a criminal history category of I

leading to an advisory sentencing range of 63 to 78 months.

The Court sets forth its analysis of the sentencing factors required by *Booker* and the

statutory guidance provided by 18 U.S.C. §3553(a) as follows:

(a) **Factors to be considered in imposing a sentence.**

The court shall impose a sentence sufficient, but not greater than necessary, to comply

with the purposes set forth in paragraph (2) of this subsection.  The court, in determining the

particular sentence to be imposed, shall consider -

**(1)  The Nature and Circumstances of the Offense and the History and
Characteristics of the Defendant**

The defendant was born on June 3, 1977, and is now 29 years of age.  He has some

college education but no degree.  He has never married and denies fathering any children.  The

(1:06 CR 75)

marriage of his parents ended in divorce when he was approximately five years of age and he

was raised by his mother but maintained a good relationship with his father.  The defendant has a

prior conviction for passing bad checks.  The date the offense was October 19, 2005, and he was

sentenced to one year probation.

The defendant plead guilty on April 25, 2006, to a one count information charging him

with a violation of 15 U.S.C. § 78j(b) and 78 ff, Manipulative and Deceptive Devices and 17

CFR § 240.10b-5.  There is no plea agreement in the case.

The information is summarized in the presentence report as follows:

> From about 2001 through September 2005, the defendant
> unlawfully, willfully and knowingly, by the use of the means and
> instrumentalities of interstate commerce and of the mails, directly
> and indirectly, would and did use and employ, in connection with
> the purchase and sale of securities, manipulative and deceptive
> devices and contrivances in contravention of 17 Code of Federal
> Regulations, section 240.10b-5, by (a) employment devices,
> schemes and artifices to defraud, (b) making untrue statements of
> material facts and omitting to state material facts necessary in
> order to make the statements made, in the light of the
> circumstances under which they were made, not misleading, and
> (c) engaging in acts, practices and courses of business which
> operated and would operate as a fraud upon investors, in
> connection with the purchase and sale of the securities, to wit:
> shares of the Agnitio Funds.

The offense conduct is described in the presentence report at paragraph 5 through 15

which follow:

> The defendant was the president and founder of Agnitio Fund
> Management LLC (Agnitio) and responsible for managing its
> administrative operations, serving as both trader and internal
> accountant.  He was also responsible for reporting the Agnitio
> Funds' assets and performance to clients and prospective clients.

2

(1:06 CR 75)

Agnitio was an investment adviser as that term is defined in § 202 of the Investment Advisers Act of 1940, codified at 15: U.S.C. § 80b-1, and regulations promulgated by the United States Securities and Exchange Commission (SEC).  It provided investment advisory services to individual investors and entities, but was not registered with the SEC.

The Insula and Miletus Funds were the Agnitio's hedge funds, which were designed to minimize market risk by the use of investment strategies and tools, such as options, to offset the market risks inherent in one transaction by market risks in the opposite direction.  Agnitio maintained accounts at Key Bank and JP Morgan Bank One in Cleveland, Ohio with the defendant being the sole authorized signatory on these accounts.

From about the end of 2001 through September 2005, the defendant promoted and sold securities to 38 different investors in the state of Ohio, Virginia, New York, Michigan, North Carolina and Florida, in a principle amount of approximately $1,500,000. Rather than actually investing all of the client funds, the defendant used a small portion of the funds from subsequent investors to make payments to previous investors including family members. He spent the majority of the funds on his personal expenses.

To induce clients to participate in his investment program, the defendant would falsely represent, orally and in writing, that Agnitio had assets under management of at least $11 million.  he also fraudulently represented and guaranteed that his trading strategy in the hedge funds would generate extraordinary rates of return from between 20 to 25 percent compounded on a quarterly basis, knowing that the substantial portion of investor proceeds would not be used in that manner.

After receiving investor funds, the investors were provided with a listing of the stock positions purportedly held by the Agnitio Funds; however, they received no other written information regarding their investment.  This written material did not state any risk associated with Agnitio or financial information about the defendant or his company.

The defendant would falsely represent that the investors were achieving high returns on their investments, causing most investors

3

(1:06 CR 75)

> to "roll over" their existing investment and lull them into the belief that their investments were making money.  Some of the investors even placed more money into the Agnitio funds based on the defendant's false statements as to performance.
>
> To conceal and perpetuate the scheme to defraud his clients, the defendant issued false and misleading financial statements, account statements and performance summary documents.  In at least one instance, he fabricated an "independent" audit report from KMPG which purported to be an audit of Agnitio.  he also prepared false and fictitious investor tax documents, known as K-1 Forms, causing some investors to report non-existent income on their tax returns.
>
> Due to the misappropriation and misapplication of these investor funds, the Agnitio investments went into default.  During the period from about late 2001 to September 2005, the defendant charged and received directly from investors approximately $1.5 million in investor monies.  Of that amount, the defendant paid out approximately $300,000 to investors.
>
> A spreadsheet completed by the FBI shows that from September 20, 2002 to July 18, 2005, the defendant paid numerous expenses for Nathan Bonner from his company's accounts, including his tuition, rent, checks and wired money.

The presentence report provides the names of the 37 victims who lost a total of

$1,203,696.75.  In the defendant's brief in support of a downward departure, the following

factual representation appears:

> The investigation herein was triggered, on or about September 7, 2005, when Bonner, of his own accord, went to the FBI office in Cleveland, bringing with him all of the documentary evidence of the crime herein, waived his right to counsel, and gave a full confession.  In his written statement, he very candidly told Agent Smith the details of his crime.  He told Agent Smith that he engaged in the conduct for four years and that it involved approximately 38 investors who invested approximately $1.5 million; that when he began to lose money, he did not inform his client, but instead created fictitious account statements, indicating

4

(1:06 CR 75)

> that the accounts were doing well, and indicating that the clients
> owned specific securities that they did not really own.  He told
> Agent Smith that all of the fruits of his crime were created using
> his computers, he provided a CD to Agent Smith that contained
> much of the incriminating evidence against him, and he indicated
> his willingness to turn his computers over to Agent Smith.  He
> indicated that he returned approximately $640,000 of the
> investors' money, and that he spent the rest over the past four
> years, including monthly apartment rental payments of $2,000 and
> monthly car lease payments of $587.  He provided Agent Smith
> with the named (sic) of all bank accounts that he used.  He also
> turned over to Agent Smith a check from one of the victims,
> Michael Zimmerman, which he had not yet deposited.  In
> summary, a review of his written statement clearly indicates that
> Bonner was anything but an obstructionist.
>
> This information and documentation concerning his crime, which
> was voluntarily and unilaterally turned over by Bonner to the
> Government, and his subsequent willingness to plead guilty, saved
> the Government tens of thousands of dollars that might have
> otherwise gone into the investigation and prosecution of this crime.

The Court questioned the government about that representation and it conceded that the

defendant approached the FBI and acknowledged his criminal conduct but that the evidence

indicated that he had returned only approximately $300,000 rather than the claimed $640,000.

The government also indicated that the victims began registering complaints within days of the

defendant's visit to the FBI as the entire fraudulent scheme was collapsing.

### (2)  The Need for the Sentence Imposed

### (A) to reflect the seriousness of the offense, to promote respect for the law, and to provide just punishment for the offense;

At the sentencing hearing on July 27, 2006, several victims outlined the hardship visited

upon them by the defendant's conduct.  Not only did the victims lose substantial sums of money,

but they also filed income tax returns listing the alleged income that their investments had earned

(1:06 CR 75)

when in fact they never received any reportable income.  It is obvious that the defendant took

advantage of the trust that his investors placed in him and as a consequence lost substantial sums

of money that will diminish their retirement expectations to the point that some of the investors

will be required to work beyond the normal retirement age.  Although it never ceases to amaze

the Court of the number of gullible victims who invest in what is obviously a ponzi scheme in

the belief that they will get rich quick, it is important that the sentence imposed recognize the

seriousness of the defendant's conduct and a lengthy sentence is required to promote respect to

the law and provide just punishment for the offense.

### (B)  to afford adequate deterrence to criminal conduct;

It is unlikely that any sentence imposed upon this defendant will provide adequate

deterrence for the type of criminal conduct present in this case.  As long as there are gullible

victims in the world who believe that they can get rich quickly, there will be persons like the

defendant who take advantage of such gullible victims.  In the Court's view, whatever sentence

is imposed will probably not provide adequate deterrence for those persons, who like the

defendant, created a ponzi scheme and profited thereby.

### (C)  to protect the public from further crimes of the defendant;

It is the Court's view that a substantial sentence will protect the public from further

crimes of this defendant.  It is the Court's view that while the defendant is incarcerated, he will

come to the conclusion that the type of fraudulent conduct that he visited upon his gullible

victims is not worth the time that he will spend while incarcerated.

(1:06 CR 75)

> **(D) to provide the defendant with needed educational or**
> **vocational training, medical care, or other correctional**
> **treatment in the most effective manner;**

The defendant has a limited amount of college education.  Hopefully, he will use the time

while incarcerated to advance his education to the point that he will be employable in lawful

occupations.

## CONCLUSION

The Court finds that a sentence of 72 months, as well as three years of supervised release

and an additional order of restitution, is a reasonable conclusion under the analysis set forth

herein.

IT IS SO ORDERED.


 July 27, 2006                                             /s/ David D. Dowd, Jr.
Date                                                        David D. Dowd, Jr.
                                                            U.S. District Judge